GEORGE B. BISSELL, DAVID T. ROBINSON, AND CALVIN DAY, PLAINTIFFS IN ERROR, *v.* THE CITY OF JEFFERSONVILLE.

The common council of the city of Jeffersonville, in Indiana, had authority to subscribe for stock in a railroad company, and to issue bonds for such subscription, upon the petition of three-fourths of the legal voters of the city. The statutes of the State examined by which such authority was conferred.

Under one of these acts, the common council determined that three-fourths had

so petitioned; and under a subsequent act, authorizing them to revise the
subject, they again came to the same conclusion, and issued the bonds.

Jurisdiction of the subject-matter on the part of the common council was made
to depend upon the fact whether the petitioners whose names were appended
constituted three-fourths of the legal voters of the city, and the common coun-
cil were made by the laws the tribunal to decide that question.

When sued. upon the bonds by innocent holders for value, it was too late to
introduce parol testimony to show that the petitioners did not constitute three-
fourths of the legal voters of the city.

Duly certified copies of the proceedings of the common council were exhibited
to the plaintiffs at the time they received the bonds, and upon the bonds
themselves it was recited that three-fourths of the legal voters had petitioned
for the subscription. The railroad company and their assigns had a right,
therefore, to conclude that they imported absolute verity.

THIS case was brought up by writ of error from the Circuit
Court of the United States for the district of Indiana.

The facts of the case are fully stated in the opinion of the
court.

It was argued by *Mr. Taft* upon a brief filed by *Taft* and
*Perry,* and also one filed by *Mr. McDonald,* for the plaintiffs
in error, and by *Mr. Reverdy Johnson* upon a brief filed by *Mr.
Crawford* for the defendants.

The reporter despairs of giving an account of these argu-
ments within a reasonable space, and therefore omits them
altogether.

Mr. Justice CLIFFORD delivered the opinion of the court.

This case comes before the court upon a writ of error to the
Circuit Court of the United States for the district of Indiana.
It was an action of assumpsit, and was instituted by the pres-
ent plaintiffs against the corporation defendants, to recover
two instalments of interest which had accrued upon certain
bonds, purporting to have been duly issued in the name of
the defendants, for stock subscribed in their behalf by the
common council of the city to the Fort Wayne and Southern
Railroad Company. Assuming to act in behalf of the city,
the common council subscribed two hundred thousand dollars

to the stock of the railroad company, and on the twenty-fourth day of April, 1855, issued two hundred bonds, of one thousand dollars each, in the name of the city, and subsequently delivered the same to the railroad company, in payment for the stock previously subscribed. Interest on the whole amount of the loan was to be paid semi-annually in the city of New York, at the rate of six per cent., and coupons or warrants for the same, payable to bearer, were annexed to each separate bond. Plaintiffs became the holders, for value, and in the usual course of their business, of thirty-seven of these bonds; and the suit in this case was founded on thirty-seven of the coupons for the first instalment of interest, and thirty-six coupons for the second instalment. As amended, the declaration contained a count for money had and received, and a special count upon each of the seventy-three coupons. Defendants pleaded the general issue, and also filed a special plea, in bar of the cause of action set forth in the several special counts. More particular reference to the special plea is unnecessary, as it was subsequently held bad on general demurrer, and at the same time the parties went to trial on the general issue.

To maintain the issue, on their part, the plaintiffs, in the first place, introduced one of the original bonds, which is set forth at large in the record. Among other things, it recites, in effect, that it was issued by authority of the common council of the city, and that three-fourths of the legal voters thereof "petitioned for the same, as required by the charter." They also gave in evidence, without objection, the several coupons described in the declaration. All of the coupons, as well as the bonds given in evidence, were signed by the mayor of the city, and were countersigned by the city clerk, and the defendants admitted their execution.

Presentment and protest of the coupons for non-payment were also duly proved by the plaintiffs; and to show that the bonds were duly and legally issued, they introduced the records of the common council of the city, and the minutes of their proceedings upon that subject. From that record it appeared that on the twenty-third day of August, 1853, a

petition of certain legal voters of the city was presented to the common council, representing that the construction of the before-mentioned railroad would be of great benefit to the public generally, and especially to the commercial interests of the city, and praying that the board to which it was addressed would subscribe stock in the railroad to the amount of two hundred thousand dollars, and contract a loan for an equal amount, through the issue of city bonds, for the payment of the subscription. That petition purports on its face to have been signed by four hundred and sixty-seven persons, and it recites that they constituted at that time three-fourths of the legal voters of the city. On the day of its presentation it was referred by vote of the common council to three members of the board, who reported in effect that they found, upon examination of the petition, and of the poll-book of the last charter election, that the names of more than three-fourths of the legal voters of the city were appended to the petition, and they also reported a preamble and resolution to carry into effect the prayer of the petitioners. Evidently the report of the committee was entirely satisfactory, as the record shows that the resolution was immediately adopted, without alteration or amendment, by the unanimous vote of the board.

Without reproducing the document, it will be sufficient to say, that the common council thereby resolved, in case the road came into the city, to subscribe two hundred thousand dollars to the stock of the railroad company, and the preamble, which was adopted as a part of the resolution, expressly affirmed the fact reported by the committee, that more than three-fourths of the legal voters of the city had petitioned for that object. Pursuant to that determination, the parties having met, and arranged the terms and conditions of the proposed agreement, a contract was made with the railroad company, that the common council should make the subscription thus authorized, and execute and deliver the bonds of the city to the company for an equal amount in payment for the stock. Throughout the period when these proceedings took place, the parties to them, it seems, had acted upon the supposition that the fifty-sixth section of the general law of the State for the

incorporation of cities fully authorized the defendants, through their common council, to make the subscription and issue the bonds. Before the bonds were issued, however, the Supreme Court of the State decided, in an analogous case, that no such authority was conferred upon cities by that section. 1 Rev. Stat., 215; the City of ·Lafayette *v.* Cox, 5 Ind. R., 38.

Some delay ensued in issuing the bonds, apparently in consequence of that decision; but on the twenty-first day of February, 1855, the Legislature of the State passed an additional act to enable cities which had subscribed for stock in companies incorporated to construct works of public utility to ratify such subscriptions. By the first section of that act, the common council of any city which had contracted such obligations or liabilities upon the supposition that they were authorized so to do under the provisions of the former act might, "at any time ·after the passage of this act, ratify and affirm such sub-scription;" and upon such ratification it was expressly enacted, that "such subscription, and the obligation and liabilities, and the corporate bonds or obligations issued or to be issued therefor by such city, shall be valid." Sess. Acts 1855, p. 132. To prove such ratification, the plaintiffs introduced the record of the subsequent proceedings of the common council of the city, showing that at their meeting held on the ixth day of April, 1855, it was resolved by the board, then in session, that the former contract between the city and the before-mentioned railroad company, "for two hundred thousand dollars, be and the same is hereby confirmed and ratified."

In this connection, the plaintiffs also proved by the same record, that the common council, on the thirteenth day of April of the same year, authorized and directed the mayor of the city and the city clerk to procure and sign two hundred bonds, of a thousand dollars each, in the name of the city, and deliver the same to the railroad company, reciting in the resolution upon the subject that the proceeding was in accordance with the statute of the State, and the contract and arrangement previously made with the railroad company.· Prior to the trial, the court, by the consent of parties, appointed a com-missioner to take such evidence as either party might direct

to have taken, and to report both the evidence and his finding of the facts proved by it, subject to all exception as to the competency of the testimony, and the correctness of his finding. He reported that three-fourths of the legal voters of the city had not signed the petition to the common council, which constituted the foundation of their action in making the subscription to the stock and issuing the bonds. This report was accompanied by the several depositions on which it was founded, and the transcript shows that certain portions of the testimony of the deponents tended to prove the fact reported by the commissioner. Defendants offered the report, with the several depositions, in evidence, to prove, among other things, that the petition in question was not signed by three-fourths of the legal voters of the city. They also offered oral evidence to prove the same fact. To all such testimony the plaintiffs objected, and also moved the court to suppress all such portions of the depositions taken by the commissioner as tended to prove that a less number than three-fourths of the legal voters had petitioned for the subscription to the stock and for the issuing of the bonds. But all of these objections of the plaintiffs were overruled by the court, and the report of the commissioner, with the depositions as taken by him, and the parol testimony, were admitted to the jury, and the plaintiffs excepted to the several rulings in that behalf. Further testimony was then given by the plaintiffs, showing that the bonds in question were negotiated to them for value by the agent of the railroad company; and that the agent, at the time they were received, exhibited to them the certificate of the city clerk, under the seal of the city, giving a condensed statement of the proceedings of the common council from the presentation of the petition to the delivery of the bonds, and affirming, in effect, that all those proceedings appeared of record in the office of the city clerk; and they further proved, that he also exhibited to them at the same time another certificate, signed by the mayor of the city and city clerk, showing that the bonds had been exchanged with the railroad company for an equal amount of their capital stock, and affirming that the exchange was authorized by the contract between the parties and the

resolutions of the common council of the city. After the testimony was closed, the court instructed the jury to the effect that, if they found from the evidence that three-fourths of the legal voters of the city had petitioned for the subscription to the stock, and for the issuing of the bonds, their verdict should be for the plaintiffs; but if they found that three-fourths of the legal voters had not so petitioned, then their verdict should be for the defendants. Under the rulings and instructions of the court, the jury returned their verdict in favor of the defendants, and the plaintiffs excepted to the instructions.

1. On that state of the case the main question presented for decision is, whether it was competent for the defendants to introduce parol testimony to prove that three-fourths of the legal voters of the city did not petition for the subscription to the stock and the issuing of the bonds. That question is raised, as well by the exceptions to the rulings of the court in admitting such testimony as by those taken to the instructions given to the jury.

Some further reference, however, to the law under which the common council acted, in making the subscription and in issuing the bonds, becomes necessary before we proceed to the examination of that question. It is conceded on both sides that the defendants had adopted the general law of the State, entitled an act for the incorporation of cities, before any of these proceedings were commenced. Prior to the adoption of that law by the corporation, the charter of the city authorized the common council to subscribe, in the name of the city, for any amount of stock in railroad or turnpike companies formed, or to be formed, for the purpose of constructing any railroad or turnpike from the city to any other point, provided the stock so held by the city did not, at any time, exceed one hundred thousand dollars; and with that view, they were authorized to borrow money or issue bonds to pay for such stock. But it is admitted by the plaintiffs that the corporation, at the date of the proceedings in question, was duly organized under the subsequent general law for the incorporation of cities, which provides, in effect, that the acceptance of that act by any incorporated city shall be deemed a surren-

der by such city of its prior charter. By the fifty-sixth section of the last-named act it is also provided, that no incorporated city, under this act, shall have power to borrow money, or incur any debt or liability, unless three-fourths of the legal voters shall petition the common council to contract such debt or loan. All of the proceedings in question which led *to the contract* for the subscription to the stock took place under that provision of the charter; and we have already adverted to the fact that the Supreme Court of the State decided, before the bonds were issued, that, by its true construction, it did not authorize a subscription to the stock of a railroad company. At the argument, the construction adopted by the State court was controverted by the counsel of the plaintiffs. But suppose it to be correct; still the limitation or restriction was one created by the Legislature which granted the charter, and certainly it was competent for the same authority to repeal it altogether, or to substitute some other in its place.

Municipal corporations are created by the authority of the Legislature, and Chancellor Kent says they are invested with subordinate legislative powers, to be exercised for local purposes connected with the public good, and such powers are subject to the control of the Legislature of the State. 2 Kent's Com., p. 275.

Whatever may be the true construction of that section of the charter, it is nevertheless certain that it was under that provision that the petition for the subscription was presented to the common council, and it is equally certain that it was under the same provision that they heard and determined the question whether the petition actually contained the signatures of three-fourths of the legal voters of the city. Bad faith is not imputed to the board, nor is it denied that they acted "upon the supposition" that they were authorized by that provision, on "the written petition of three-fourths of the legal voters of the city," to subscribe for the stock and contract to issue the bonds. Having ascertained and determined that three-fourths of the legal voters had petitioned, they adopted the resolution reported by the committee, and entered into the contract with the railroad company. Clearly, therefore, the

common council had contracted the obligation to take the stock; and in case of refusal, would have been liable in damages for a breach of the contract. Other cities in the State had contracted like obligations under similar circumstances; and to remedy the anticipated difficulty, and to remove the doubt first suggested by the decision of the Supreme Court of the State, the Legislature passed the explanatory act of the twenty-first of February, 1855, to which reference has been made.

Sufficient has already been remarked to show that the circumstances of the case exhibited in the record bring it within the very terms of the act; and if so, then the common council might lawfully ratify and affirm the subscription; and upon such ratification it is expressly declared that the bonds issued or to be issued shall be valid.

Mistakes and irregularities in the proceedings of municipal corporations are of frequent occurrence, and the State Legislatures have often had occasion to pass laws to obviate such difficulties. Such laws, when they do not impair any contract, or injuriously affect the rights of third persons, are generally regarded as unobjectionable, and certainly are within the competency of the legislative authority. Unlike what is sometimes exhibited in laws of this description, the Legislature did not attempt to ratify the subscription, but left the matter entirely optional with the common council, as the representatives of the city, to accept or reject the proffered remedy. They elected to ratify and affirm the subscription; and by so doing, gave the same effect to the contract to subscribe for the stock, and to all the proceedings that led to it, as if the authority to make it had been coeval with the presentation of the petition on which those proceedings were founded. No injustice will result from this conclusion, as it is obvious that the contract had been made in good faith, under the full belief that they were duly authorized to subscribe for the stock, and issue the bonds in the name of the city, so that the only operation of the confirmatory resolution was to give the very effect to the proceedings which they had intended, but which, from the defect in their authority, had not been accomplished.

Watson *v.* Mercer, 8 Pet., p. 111; Wilkinson *v.* Leland et al., 2 Pet., p. 661.

Authority on the part of the common council to subscribe for the stock, and to issue the bonds on the petition of three-fourths of the legal voters of the city, is therefore shown to have existed, and must be assumed in the further consideration of the case. With this explanation as to the authority of the common council, we will proceed to the examination of the main question discussed at the bar.

2. It is insisted by the plaintiffs that the defendants had no right to disprove the verity of their own records, certificates, and representations, concerning the facts necessary to give validity to the bonds. On the other hand, the defendants controvert that proposition, and insist that it was competent for them under the circumstances to prove, by parol testimony, that the records given in evidence did not speak the truth, and that, in point of fact, three-fourths of the legal voters had not petitioned, as required by the charter. Unless three-fourths of the legal voters had petitioned, it is clear that the bonds were issued without authority, as by the terms of the explanatory act it could only apply to a case where the common council of a city had contracted the obligation or liabilities therein specified upon the petition of three-fourths of the legal voters of such city; and if no such petition had been presented, or if it was not signed by the requisite number of the legal voters, the law did not authorize the common council to ratify and affirm the subscription. That fact, however, had been previously ascertained and determined by the board to which the petition was originally addressed.

After the explanatory act was passed, the common council were fully authorized to revise the finding of the former board; and if it did not appear, upon inquiry and proper investigation, that it was correct, it was their duty, as the representatives of the city, to have refused to ratify and affirm the contract for the subscription. Such an inquiry might have been made through the medium of a committee, as it had been when the petition was presented, or in any other mode, satisfactory to the board, which would enable them to ascertain the true state

of the case. By the terms of the explanatory act they were authorized to ratify and affirm the subscription, if the obligation or liability incurred had been contracted on the petition of three-fourths of the legal voters of the city; and, of course, the necessary implication is, that they must be satisfied that the requisite number had petitioned. In making that investigation, however, it was not required that there should be a new petition, and the law is entirely silent as to the manner in which it was to be conducted. If the common council was composed of the same persons who had already passed upon the question, further investigation was unnecessary, provided they were satisfied with their former determination. Such of the members as knew the record of the fact to be correct might safely act upon their own personal knowledge, without further inquiry; and if there were any who had not been members of the board when the prior determination was made, they might ascertain the fact in any mode which was satisfactory to themselves and their associates. Nothing appears in the record to show whether further information upon the subject was necessary or desirable, or, if so, what means were adopted to obtain it; but it does appear that the board unanimously resolved to ratify and confirm the contract with the railroad company, and subsequently issued the bonds, reciting in each that it was issued by authority of the common council of the city, "three-fourths of the legal voters of the city having petitioned for the same as required by the charter." Taken together, we think the record of the resolution ratifying and confirming the contract, and the recital in the bonds, furnish conclusive evidence in this case that the common council did readjudicate the question, whether the requisite number of the legal voters of the city had signed the petition. Fraud is not imputed in this case, and it does not appear that it was even suggested at the trial in the court below that the board neglected that duty at the time the contract was confirmed; but the defence was, that the finding was erroneous, because the petition, as matter of fact, did not contain three-fourths of the legal voters of the city.

3. It only remains to consider the effect of that determina-

tion as between the defendants and the holders for value of the bonds, without notice of the supposed defect in the proceedings under which they were issued, and put into the market. Two hundred bonds, with twelve hundred interest warrants, or coupons, were issued in the name of the city, and the coupons, as well as the bonds, were payable to bearer. Interest was payable semi-annually, but the redemption of the principal was postponed for a period exceeding twenty-five years. Capitalists could not be expected to accept such paper, and advance money for it, unless the authority to issue it was put beyond dispute. They certainly would not pay value for such securities, with knowledge that the question under consideration would be open to litigation whenever payment, either of principal or interest, was demanded. Purchasers of such paper look at the form of the paper, the law which authorized it to be issued, and the recorded proceedings on which it is based. When the law was passed authorizing the common council to ratify and affirm the contract with the railroad company, it must have been understood by the Legislature that the bonds were to be received by the company in payment for the stock, and used as a means for borrowing money for the construction of the road, and it could hardly have been expected that the object could be accomplished, if, by the true construction of the act, it contemplated that the bonds should be issued before it was conclusively determined that the requisite number of the legal voters of the city had petitioned the common council. But a much stronger reason why that construction cannot be adopted is, that it would involve an absurdity, as it would render the law altogether inoperative, or else it would admit that the bonds might be issued without authority.

Whether three-fourths of the legal voters had petitioned or not, was a question of fact; and if not ascertained and conclusively settled before the bonds were issued, it would remain open to future inquiry, and might be determined in the negative; and clearly the common council could not lawfully ratify and affirm the subscription, unless that proportion of the legal voters had petitioned; and without such ratification, the bonds

would be invalid. Beyond question, therefore, that construction must be rejected.

Jurisdiction of the subject-matter on the part of the common council was made to depend upon the petition, as described in the explanatory act, and of necessity there must be some tribunal to determine whether the petitioners, whose names were appended, constituted three-fourths of the legal voters of the city, else the board could not act at all. None other than the common council, to whom the petition was required to be addressed, is suggested, either in the charter or the explanatory act, and it would be difficult to point out any other sustaining a similar relation to the city so fit to be charged with the inquiry, or one so fully possessed of the necessary means of information to discharge the duty. Adopting the language of this court in the case of the Commissioners of Knox county *v.* Aspinwall et al., 21 How., 544, we are of the opinion that "this board was one, from its organization and general duties, fit and competent to be the depositary of the trust confided to it." Perfect acquiescence in the decision and action of the board seems to have been manifested by the defendants until the demand was made for the payment of interest on the loan. So far as appears, they never attempted to enjoin the proceedings, but suffered the authority to be executed, the bonds to be issued, and to be delivered to the railroad company, without interference or complaint.

When the contract had been ratified and affirmed, and the bonds issued and delivered to the railroad company in exchange for the stock, it was then too late to call in question the fact determined by the common council, and *a fortiori* it is too late to raise that question in a case like the present, where it is shown that the plaintiffs are innocent holders for value.

Duly certified copies of the record of the proceedings were exhibited to the plaintiffs at the time they received the bonds, showing to a demonstration that further examination upon the subject would have been useless; for, whether we look to the bonds or the recorded proceedings, there is nothing to indicate any irregularity, or even to create a suspicion that the bonds had not been issued pursuant to a lawful authority; and

we hold that the company and their assigns, under the circumstances of this case, had a right to assume that they imported verity.

Citation of authorities to this point is unnecessary, as the whole subject has recently been examined by this court, and the rule clearly laid down that a corporation, quite as much as an individual, is held to a careful adherence to truth in their dealings with other parties, and cannot, by their representations or silence, involve others in onerous engagements, and then defeat the calculations and claims their own conduct has superinduced. Zabriskie *v.* the Cleveland, &c., Railroad Co., 23 How., 400.

For these reasons, we are of the opinion that the parol testimony was improperly admitted, and that the instructions given to the jury were erroneous. The judgment of the Circuit Court is therefore reversed, with costs, and the cause remanded, with directions to issue a new venire.