FRANCIS A. VOGT, JR., BY HIS NEXT FRIEND, FRANCIS A. VOGT, SR., PETITIONER-APPELLANT, v. BOROUGH OF BELMAR, DEFENDANT-RESPONDENT.

Argued December 7, 1953—Decided January 11, 1954.

196

*Mr. Thomas F. Shebell* argued the cause for the appellant (*Mr. Stephen D. Maguire,* attorney).

*Mr. Arthur F. Mead* argued the cause for the respondent (*Messrs. Cox & Walburg,* attorneys).

The opinion of the court was delivered by

HEHER, J.   On May 22, 1950, appellant suffered personal injury under circumstances that concededly would entitle him to compensation under the State Workmen's Compensation Act of 1911, as amended, *R. S.* 34:15–7 *et seq.,* if at

the time of the mishap he bore to the defendant. Borough of Belmar the relationship contemplated by section 43 of the act, as amended by *c*. 430 of the *Session Laws of* 1948, *N. J. S. A.* 34:15–43, providing, *inter alia*, that with certain exceptions not here pertinent, "each and every active volunteer fireman doing public fire duty and also each and every active volunteer, first aid or rescue squad worker doing public first aid or rescue duty under the control or supervision of any commission, council or any other governing body of any municipality or any board of fire commissioners of such municipality or of any fire district within the State, who may be injured in line of duty" shall be compensated under the act.

By way of a more specific definition of the class, it is further provided that

"Every active volunteer fireman shall be deemed to be doing public fire duty under the control or supervision of any such commission, council, governing body, board of fire commissioners or fire district within the meaning of this section, if such control or supervision is provided for by statute, or if the fire company of which he is a member receives contributions from, or a substantial part of its expenses or equipment are paid for by, the municipality, or board of fire commissioners of the fire district or if such fire company has been or hereafter shall be designated by ordinance as the fire department of the municipality."

The self-same definitive terms are, by another clause, made applicable to first aid and rescue squad workers.

There were later amendments of these provisions, but no contextual changes of significance here. The statutory benefits were extended to "volunteer firemen" doing "public fire duty" under the control or supervision of the board of managers of any state institution, and to "active volunteer firemen" while participating "in any authorized public showing, exhibition, or parade of * * * volunteer firemen." *L.* 1951, *c.* 211, *p.* 757; *L.* 1952, *c.* 317, *p.* 1038.

The cited amendatory act of 1948 also amended section 74 of the Compensation Act, *R. S.* 34:15–74, to lay upon the enumerated local governing bodies the duty of providing

compensation insurance for "volunteer firemen doing public fire duty and volunteer first aid and emergency squad workers doing public first aid and rescue duty under the control or supervision" of any such local authorities, "within the meaning" of section 43. This insurance coverage was extended to firemen who were members of a first aid or rescue squad created within the fire company of which they were members, or recruited from more than one fire company, "for injuries received while acting in response to any call made upon such squad, for first aid or rescue work, whether such call be made because of a fire or otherwise." This section was amended to include county fire marshals within the insurance category, the insurance to be provided by the board of chosen freeholders. *L.* 1952, *c.* 316, *p.* 1036.

On June 6, 1933, the defendant borough adopted an ordinance providing that "The Union Fire Company No. 1, the Volunteer Hook and Ladder Company No. 1, the Goodwill Hose Company and such other companies as the Mayor and Commissioners may, by resolution, from time to time, designate and approve shall constitute the Fire Department of the Borough." *Section* 1, *Article* 1. Persons then members in good standing of the named fire companies were thereby "recognized as members of the Fire Department," provided they signified in writing, within a specified time, their "willingness and ability to conform with the rules and regulations governing" the Department; and "All other members shall be elected to membership and subject to the approval of the Mayor and Commissioners as hereinafter provided." *Section* 2, *Article* 1. But there was no subsequent provision relating to "approval" of individual membership except *Section* 4, *Article* 2, of which more hereafter. The "applicant for membership to the Fire Department," apart from certain specified personnel qualifications—*e. g.,* "Be between the ages of 21 years and 35 years"—shall "Be approved for membership by filing a written application for membership into a recognized Company of the Department which application shall be certified by the Captain of said Company and approved by the Chief of the Department,

before said application shall be voted upon." *Section 3, Article 1(7)*. And then it is provided by *Section 4, Article 2*, heretofore adverted to, that "Each member shall, upon election be given a membership certificate showing the date of his election to membership, signed by the Mayor, attested by the Borough Clerk and countersigned by the Chief with the corporate seal of the Borough attached, and a badge of membership in the Department to be worn at all times when on duty, which badge shall be the property of the Borough * * *." The companies comprising the department are largely autonomous. Grievances and charges of misconduct are heard within the department; and the department is governed and managed by a board of fire officers consisting of the chief and assistant chiefs, "subject to the approval of the Mayor." *Section 4, Articles 5, 6, 7, 8; Section 5*. The chief, assistant chiefs "and other officers of the Department shall be elected from within the membership of the fire companies, * * * subject to the approval and confirmation of the Mayor and Commissioners of the Borough"; and a captain, lieutenant and secretary "shall be chosen by each company of the Department from the members of said company." *Section 6, Article 1; Section 7, Article 1*. But the ownership of "all apparatus, equipment, hose and other property used by the Department shall be vested" in the borough; and the mayor and commissioners "shall have authority to lease or purchase adequate housing facilities for fire apparatus, equipment, supplies and furnishings for the fire department." *Section 8, Articles 5, 7*. Compensation is provided for the chief, assistant chiefs, and "drivers" of apparatus, ranging from $100 *per annum* for the chief to $25 *per annum* for drivers, seemingly hardly more than a token or nominal stipend, considered in relation to the character of the service. *Section 9, Article 1*.

Volunteer Hook and Ladder Company No. 1 was incorporated February 21, 1894, before the defendant borough came into being. It became a constituent unit of the defendant borough's fire department under the cited ordinance, but its corporate autonomy remained intact save as modified by the

integration. It adopted a new charter on February 21, 1944, and there were amendments on June 12 ensuing. Its 1944 constitution, *Article* III, *sections* 1, 2, 3, 6, provides for "three classes of membership: Active, Honorary and Junior." "Active membership" is made available to citizens who are residents of the borough for at least two years, "not under the age of 21 years, * * * after serving six months probation"; and "A Junior member shall be anyone under the age of 21, duly elected to membership," but the "age of entering as a Junior shall be 17 years or over." Upon attaining majority, the junior member becomes "an active member" upon payment of the prescribed initiation fee. The "revenue" of the company, *Article* VI, *section* 1, "shall be derived from initiation fees and annual membership dues, and from such other sources as may be approved by this Company."

On May 11, 1950, at a meeting of the company, the appellant, then 17 years of age, was "elected to Junior Membership," and the secretary was directed "to notify the Borough Clerk," but notification was not given until later. The minutes are so written.

As was the practice with junior members, appellant responded to a fire call made May 23 ensuing, proceeding by motorcycle; under his superior officers, he played an active role in putting down the fire, and was injured when on his return the motorcycle collided with a street curb.

By letter bearing date May 23, 1950, but not received until May 29 ensuing, the company's secretary advised the borough clerk that "at the last regular meeting" of the company, the appellant "was elected to Junior membership," and request was made that the board of commissioners be advised of the action. On June 13 ensuing, the municipal governing body adopted a resolution "confirming" the election of appellant to "Junior membership" in the company.

The Appellate Division ruled that while under the ordinance the members of the several company units were "recognized as members of the Fire Department," new members were required to be of age and "approved" by the

mayor and commissioners, and the appellant, as a "junior member" of his company, was therefore not an "active volunteer fireman" within the intendment of the Compensation Law; it was suggested that the adjective "active" implies "an understanding by the Legislature that firemen in some other classification—let us say 'honorary' firemen—might, on occasion, do public fire duty and be injured in the line of duty, and yet they would not be entitled to compensation," and the "delegation to a private group of final authority to decide who shall constitute the personnel of the Borough's Fire Department, would be of questionable constitutionality"; and it was also pointed out that the company's constitution, as well as the ordinance, "recognizes only one class of firemen, those of the age of 21 years and upward, and they are the same as are designated as active members by the" company's constitution, and thus there is no "conflict" between the constitution and the ordinance. The judgment of the County Court reversing the determination of the Compensation Bureau in favor of appellant was affirmed; and we certified the cause for appeal.

The word "active" does not necessarily have identical adjectival significance in the company's constitution and the statute. In the former the term would seem to relate simply to the classification and rank of members for the company's internal regulatory and managerial purposes; in the statute it plainly has reference, not to a category accorded general recognition in the field for administrative reasons and entailing known fixed legal consequences, but rather to volunteers given to work as firemen—*i. e.*, the actual performance in the general welfare of a gratuitously assumed hazardous duty—and not to philosophic contemplation merely or the enjoyment of the social intercourse incident to purely honorary membership.

The statute is patently designed to afford a measure of protection against voluntary occupational hazards, the very least that is due, it would seem, to those who out of a pure sense of public duty assume the risks of actual fire or safety service; and the appellant is indubitably in that category.

Immediately after his election to membership, the appellant received from the company's captain boots, a raincoat, hat and other paraphernalia bearing his initials, which he thereafter kept on the fire truck in the station house; and he was also given a badge by the borough clerk attesting to his membership in the "Belmar Fire Department, New Jersey, H and L." At the time of the issuance of the equipment, the captain instructed him as to answering fire calls; and there can be no doubt that by common consent he served as an active volunteer fireman, however he may have been classified on the membership rolls, and thereafter acted in that role.

The "junior" membership classification had obtained for almost a quarter of a century, with the knowledge and consent of the municipal governing body; and it is established by the unchallengéd proofs that the participation of members of this class in active public fire service was known to the governing body and sanctioned by long acquiescence. However it may have been at the beginning, active service came to be an incident of such membership. Mayor Mac-Learie, who was also a member of the Hook and Ladder Company, testified:

"Q. Mayor, it is a fact, isn't it, that for ten years or more you and the other officials of the City knew that there were Junior Firemen that had been admitted to membership and who had participated in fighting fires in the Borough of Belmar?

A. I recognized that.

Q. You knew there were Junior Firemen in the Fire Department for a long time?

A. I don't deny it.

Q. For over ten years?

A. Yes.

Q. And they were admitted to membership with your acquiescence, the officials' acquiescence?

A. That's right."

True, the mayor said, in answer to a prior question put on cross-examination: "It was always my opinion, of course, that he was never a qualified policeman—fireman until he was approved by the Board of Commissioners." But this was a bare conclusion which does not militate against the

long-established acquiescence in a course of procedure that recognized "junior" firemen as active firemen from the time of their election to membership in a fire company constituting a unit of the fire department. There is significance, in this regard, in the resolution of the municipal governing body adopted after the mishap to appellant, "confirming" his election by the company to "junior membership." It testifies both to knowledge of the existence of the "junior" class and the active fire-fighting service role assigned to its members.

The municipality urges, however, that there is nothing to show awareness by the governing body of the accident and the attendant circumstances at the time this action was taken; but it is well nigh inconceivable that it was not fully informed. It is rather fairly deducible that, with knowledge of the accident, the purpose was to formalize what by long-standing practice had been done informally; and the inferences from the course thus taken go far to sustain the hypothesis that the ordinance was not read as rendering "approval" by the governing body a condition precedent to membership in a constituent fire company; certainly, if the ordinance lends itself to the contrary interpretation, there was in practice a waiver under circumstances giving rise to an estoppel, not only as to this but the age provision as well.

It would be contrary to the plainest principles of justice if the municipality, having accepted active public fire service from "junior" firemen under circumstances indicating a waiver of any local law to the contrary, were now permitted to invoke the formal requisites of local law to defeat appellant's claim for compensation for the injury suffered in the rendition of that hazardous service. In analogy to estoppel relating to contracts, a municipality may be estopped to deny the exercise of its consensual authority under the conditions here obtaining. Compare *Hackett v. City of Ottawa*, 99 *U. S.* 86, 25 *L. Ed.* 363 (1879), where Harlan, J., said:

"What this court declared, through Justice Campbell, in *Zabriskie v. Cleveland, Ohio, C. C. & C. R. Co.*, 23 *How.* 381 [64 *U. S.* 381,

16 *L. Ed.* 488], as to a private corporation, and repeated, through Mr. Justice Clifford, in *Bissell v. City of Jeffersonville*, 24 *How.* 287 [65 *U. S.* 287, 16 *L. Ed.* 664], as to a municipal corporation, may be reiterated as peculiarly applicable to this case : 'A corporation, quite as much as an individual, is held to a careful adherence to truth in their dealings with mankind ; and cannot, by their representations or silence, involve others in onerous engagements, and then defeat the calculations and claims their own conduct had superinduced.' "

Here, the acceptance of public fire service tendered by persons within the "junior" class was within the corporate power ; the doctrine of *ultra vires* is not involved. A different question would be presented were such requirements created by statute. The statutory age range of 21 to 35 years is applicable only to "paid" fire departments. *R. S.* 40 :47–4; as amended by *L.* 1948, *c.* 161, *p.* 898. The application here of the doctrine of waiver and estoppel serves the statutory policy, for, in the words of the statute, the design was to place on the municipality the burden of compensation and insurance coverage to that end for "each and every active volunteer fireman doing public fire duty."

██ In respect of matters within the realm of its general power and authority, a municipal corporation is ordinarily subject to the doctrine of estoppel *in pais* to serve the demands of right reason and justice, at least where the invocation of the rule would not hinder or prejudice essential governmental functions, and especially where the irregularity or deficiency is largely technical or formal and not of the jurisdiction. *Town of Essex v. New England Telegraph Co.*, 239 *U. S.* 313, 36 *S. Ct.* 102, 60 *L. Ed.* 301 (1915). While not applied as freely against the public as in the case of private individuals, the doctrine of estoppel may be invoked against a municipality to prevent manifest wrong and injustice. *City of Los Angeles v. Los Angeles County*, 9 *Cal.* 2d 624, 72 *P.* 2d 138, 113 *A. L. R.* 370 (*Sup. Ct.* 1937).

It is argued *contra* that it was incumbent on appellant to "show that the relation of employer-employee existed at the time of the accident," and the defendant municipality

"had not accepted the employee as an employee at the time of the accident." *Brower v. Franklin Township*, 119 *N. J. L.* 417 (*Sup. Ct.* 1938), is cited for the proposition that "a master-servant relationship must exist between the municipality and the individual claiming workmen's compensation benefits as a volunteer fireman of the municipality." It was there held that the statutory relationship does not exist unless there be "a valid contract of service together with the right or power in the employer to control the employee with respect to the transaction out of which the injury arose."

True, the obligation of the optional or elective compensation provisions of *R. S.* 34:15–7 *et seq.* is in its essence contractual; the duty of compensation presupposes a contract of service. "Employer" is by the statute itself declared to be synonymous with master; and "employee" synonymous with servant, "and includes all natural persons who perform service for another for financial consideration, exclusive of casual employments," as therein defined. *R. S.* 34:15–36. In common usage, one cannot be an employee without a contract. Employment ordinarily suggests a contractual relation; and such is the primary statutory concept. *Bendler v. Bendler*, 3 *N. J.* 161 (1949). And the relationship between a volunteer fireman and the municipality is not that of master and servant in the true sense. Here, there was not a contract of hire in the technical sense; there was no provision for compensation; the relationship was rather a gratuitous consensual undertaking to perform "public fire duty" as a member of a volunteer fire company, under the "control or supervision" of the municipal governing body.

Protection against fire is a public governmental function that is generally held to exclude the master and servant relation between the municipality and the members of its fire department. *Florio v. Jersey City*, 101 *N. J. L.* 535 (*E. & A.* 1935); *Wild v. Mayor, etc., of City of Paterson*, 47 *N. J. L.* 406 (*Sup. Ct.* 1885); *McDonald v. City of New Haven*, 94 *Conn.* 403, 109 *A.* 176, 10 *A. L. R.* 193 (*Sup. Ct. Err.* 1920); *Parker v. Travelers' Insurance Co.*, 174 *Ga.* 525,

163 *S. E.* 159, 81 *A. L. R.* 472 (*Sup. Ct.* 1932). See, also, *Devney's Case,* 223 *Mass.* 270, 111 *N. E.* 788 (*Sup. Jud. Ct.* 1916); *Ludell v. Blackburn Corporation,* 3 *B. W. C. C.* (*Eng.*) 227.

The statutory provisions relating to volunteer fire companies are to be found in *R. S.* 40:47–26 *et seq.,* and the later amendments and supplements. See, also, *R. S.* 40:48–2. The local governing body is specifically empowered, by resolution, to appropriate and pay each year to "any active volunteer fireman doing public fire duty under" its "control or supervision," or that of a board of fire commissioners of the municipality or of any fire ·district thereof, "who receives no other compensation for his services," a sum sufficient "to cover any losses incurred by him in attending upon fires in the municipality \* \* \*," *R. S.* 40:47–30. And the governing body may defray the cost of group life insurance for volunteer firemen. *L.* 1945, *c.* 47, *p.* 111; *N. J. S.* 40:47–30.1, 30.2.

But however the relationship here be termed in the law, and whatever its legal consequences in other directions, it is yet one that by express statutory provision subjects the municipality to the peremptory duty of compensation under the Workmen's Compensation Act. *R. S.* 34:15–7 was enlarged by *section* 43, in 1913, to cover public "employees," and by an amendment of the latter section in 1927, to include "active volunteer firemen." *L.* 1913, *c.* 145, *p.* 230; *L.* 1927, *p.* 239. This express provision for benefits to active volunteer firemen is, as we have said, a means of protection against the adverse effects of a hazardous public volunteer service; and all such questions are out of the case.

The local authority, by a long-continued source of conduct, imparted character and meaning to the relationship that fulfills the statutory condition; and it will not be heard to disavow the obligation now that the appellant volunteer has suffered injury in the performance of the public fire duty which he assumed in good faith with its acquiescence under the established practice. The beneficent policy of the compensation provision is not to be whittled

away by over-nice distinctions and technical formality unrelated to the substance of the right.

There is no question of undue delegation of power; there was acceptance merely of volunteer fire service in the public interest.

The judgment of the Appellate Division is reversed, and the judgment of the Compensation Bureau is affirmed; and the cause is remanded for executorial proceedings accordingly.

*For reversal*—Justices HEHER, BURLING, JACOBS and BRENNAN—4.

*For affirmance*—Chief Justice VANDERBILT, and Justices OLIPHANT and WACHENFELD—3.